**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| THEMIS SOLUTIONS INC., d/b/a Clio,<br>Plaintiff,<br>v.<br>ROSS INTELLIGENCE, INC.,<br>Defendant. | Case No. 1:26-cv-3537 |

**COMPLAINT**
**FOR DECLARATORY JUDGMENT**

Plaintiff Themis Solutions Inc., d/b/a Clio ("Clio"), by and through its undersigned counsel, hereby appears and alleges as follows:

**INTRODUCTION**

1. In September 2017, Lawriter LLC ("Lawriter") began supplying case-law data and continuing updates to Defendant ROSS Intelligence, Inc. ("ROSS") under a September 27, 2017 License Agreement (the "Agreement"), attached hereto as Exhibit A. The Agreement required ROSS to pay $50,000 annually, in quarterly installments of $12,500, for continuing updates ("Updates"). ROSS stopped making those payments in mid-2020, announced in December 2020 that it was shutting down operations, and ceased operating its legal-research platform on January 31, 2021. ROSS's FTP access to the case-law feed was disabled on that date. For more than five years after its shutdown, ROSS made no further quarterly Updates payments and did not seek restoration of the data feed.

2. ROSS now claims the Agreement is still active, demands that Clio restore the feed and provide both accumulated and continuing Updates, and threatens suit if Clio does not oblige. ROSS contends that the Agreement automatically renewed in September 2020, September 2023,

and September 2026, for a term ending September 27, 2029. Clio maintains that ROSS's prolonged, uncured material breach excuses further performance, regardless of whether the Agreement automatically renewed or was formally cancelled. ROSS cannot compel renewed deliveries merely by offering to pay years after it stopped performing and shut down its service.

3. This action seeks a determination of the parties' present and prospective obligations under the Agreement, not damages for historical nonpayment. ROSS insists that Clio must resume delivering updates and has threatened a breach-of-contract claim if Clio refuses. Clio disputes that obligation and seeks a declaration that it need not resume delivering updates during the asserted renewal term in light of ROSS's prolonged material nonperformance.

## PARTIES

4. Plaintiff Themis Solutions Inc., d/b/a Clio, is a corporation organized under the laws of Canada with its principal place of business at Suite 300, 4611 Canada Way, Burnaby, British Columbia V5G 4X3, Canada.

5. Defendant ROSS Intelligence, Inc. is a Delaware corporation. Before announcing in December 2020 that it would shut down operations, ROSS last publicly identified its principal place of business as 650 California Street, San Francisco, California 94108.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because Clio is a citizen of Canada and ROSS is a citizen of Delaware. The amount in controversy exceeds $75,000, exclusive of interest and costs. ROSS demands accumulated Updates and continuing deliveries through September 27, 2029, under a purported three-year renewal term for which the Agreement specifies annual Updates fees of $50,000. An actual controversy exists concerning ROSS's asserted right to compel Clio to restore and continue delivering case-law Updates under

the Agreement, including during the renewal term ROSS asserts extends through September 27, 2029.

7. The controversy concerns the construction and prospective application of a written agreement. ROSS demands immediate restoration of the case-law data feed and continuing delivery of Updates, and maintains that Clio will breach the Agreement if it refuses. Clio disputes those obligations on multiple grounds. A declaration will resolve the parties' competing claims of contractual right and govern their present and future conduct, rather than award damages for historical nonperformance.

8. ROSS consented to personal jurisdiction in Virginia under § 12 of the Agreement. That section provides that "[a]ny suit hereunder will be brought in the federal or state courts in the Commonwealth of Virginia" and that each party "hereby submits to the personal jurisdiction thereof." This action arises under the Agreement, and ROSS's legally improper demands made thereunder.

9. Venue is proper in this District because ROSS is subject to the court's personal jurisdiction with respect to this action. 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

### A. The Agreement Separately Governs Existing Licensed Data and Continuing Updates.

10. On September 27, 2017, Lawriter and ROSS entered into the Agreement for the license and delivery of case-law data to ROSS for use in ROSS's electronic research service. The Agreement granted specified rights to Lawriter's case-law data, expressly "[s]ubject to the terms and conditions set forth in this Agreement." Agreement § 2.

11. The Agreement is governed by Virginia law. Agreement § 12. Because the Agreement licenses computer information delivered in electronic form, it is subject to the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-501.1 *et seq.* ("UCITA").

12. The Agreement defines "Licensed Data" to include "Lawriter's published and unpublished cases including the Updates." Agreement § 1.2. "Updates," in turn, include "Lawriter's cases created after the effective date of this Agreement." *Id.* § 1.5. The Agreement thus contemplated both the delivery of an existing corpus of published and unpublished judicial decisions that Lawriter had collected and compiled and the continuing delivery of additional decisions as they became available from federal and state courts. The requested declarations concern only delivery of additional case-law decisions and do not adjudicate rights to API access or the API modifications, updates, and upgrades included within § 1.5's definition of "Updates."

13. The Agreement separately priced those two components. Section 3.1 required an initial license fee of $900,000, payable in nine monthly installments of $100,000. Section 3.2 separately required ROSS to pay "$50,000.00 per year for three years of updates payable in quarterly installments of $12,500.00 per quarter beginning October 1, 2017." Section 4.2 provided for successive three-year renewal terms, subject to a limitation on price increases of 5% over the fees paid during the preceding term. Thus, ROSS's obligation to pay for continuing Updates did not expire after the initial three-year term but continued during successive renewal terms, subject to the Agreement's pricing provisions.

14. The Agreement also established distinct delivery obligations. Section 4.1 required Lawriter to make an initial delivery of Licensed Data through an FTP site within one week of the Agreement's effective date. Section 4.2 separately required Lawriter to provide Updates during the license term, including delivery of new cases by the earlier of (i) five days after they became

available from the courts or (ii) the date they became available on Lawriter's Casemaker website. Lawriter delivered the initial case-law data and made continuing Updates available to ROSS.

15. The Agreement established an initial three-year term and provided for successive three-year renewals unless ROSS gave written notice of termination at least 30 days before the end of the then-current term. *Id.* §§ 4.2, 7.1. ROSS contends that the Agreement automatically renewed in September 2020, September 2023, and September 2026, and therefore remains in effect through September 27, 2029. Clio disputes that any such renewal occurred or obligates it to resume delivering Updates notwithstanding that ROSS stopped making quarterly Updates payments in 2020 and ceased operating its legal-research platform on January 31, 2021, and, for over five years, never communicated about resuming performance under the Agreement or attempted to cure its prolonged, uncured material breach of its payment obligations.

16. Section 2.1 grants certain license rights in the Licensed Data, and § 7.2 provides that cancellation does not affect "the license rights granted in Sections 2.1 and 5.1." Clio does not seek in this action to adjudicate or extinguish ROSS's rights, if any, to case-law data previously delivered under the Agreement. The present controversy concerns ROSS's asserted right to compel Clio to furnish additional Updates, including accumulated and future case-law decisions, notwithstanding ROSS going out of business and its longstanding failure to pay the consideration required for that continuing performance.

17. Section 3.2 specifies the amount and timing of ROSS's quarterly Updates payments without making those payments contingent on receipt of an invoice. By contrast, § 5.4 expressly requires monthly invoices and usage reports for certain API overage charges. The Agreement thus expressly requires invoicing for certain charges but not for the recurring Updates payments under § 3.2.

18. The Agreement also expressly restricts modifications and waivers. Section 8.3 provides:

> No modification or amendment of any provision of this Agreement shall be effective unless made in a written instrument, duly executed by the party to be bound thereby, which refers specifically to this Agreement and states that an amendment or modification is being made in the respects set forth in such instrument.

Section 8.4 further provides that "[n]o waiver by either party of any breach of any provision of this Agreement, whether by conduct or otherwise, in any one or more instances" shall constitute "a further or continuing waiver of any such breach." It also states that "[t]he failure of either party at any time or times to require performance of any provision of this Agreement shall in no manner affect such party's right to enforce the same at a later time."

19. Section 7.2 establishes a separate procedure for cancellation following a breach. It provides that, if either party breaches or fails to perform its obligations and that breach or failure continues for "30 days after notice thereof is received from the other party," the nonbreaching party "shall have the right to cancel this Agreement immediately upon the giving of notice of cancellation to the defaulting party." *Id.* § 7.2. Thus, § 7.2 contemplates notice of breach, an opportunity to cure within thirty days, and a subsequent notice of cancellation. It further provides that cancellation does not affect the defaulting party's payment obligations for the balance of the then-current term or the license rights granted under §§ 2.1 and 5.1.

20. The parties dispute whether § 7.2's cancellation procedures are a prerequisite to Clio's withholding of further Updates following ROSS's uncured material nonpayment. Clio maintains that those procedures govern cancellation of the Agreement, but do not eliminate its separate right to withhold further performance following ROSS's extended prior material breach.

### B. ROSS Ceased Paying for Updates and Shut Down Its Service.

21. ROSS stopped making quarterly Updates payments under the Agreement by mid-2020, before the Agreement's initial term had expired. By then, Lawriter had merged with Fastcase, Inc. ("Fastcase"). Those defaults preceded the January 2021 discontinuation of FTP access and the February 2021 invoicing correspondence described below. ROSS did not satisfy its overdue quarterly payment obligations before suddenly surfacing and demanding resumed performance in June 2026, more than five years later.

22. ROSS also had substantial overdue obligations under separate commercial arrangements with Lawriter and Fastcase. On October 5, 2020, the chief operating officer of Fastcase informed ROSS's then-chief executive officer, Andrew Arruda ("Arruda"), that, although Fastcase had continued providing regulatory data feeds to ROSS under a separate agreement, Fastcase was "closing in on $100k in overdue A/R." A February 22, 2021 Fastcase receivables report reflected an outstanding balance of $150,430.76 from ROSS.

23. The recurring quarterly installments were not incidental charges. They were the consideration the parties expressly assigned to the continuing delivery of Updates. ROSS's prolonged failure to make those payments deprived the licensor of the bargained-for compensation for the very performance ROSS now seeks to compel.

24. In May 2020, Thomson Reuters and West Publishing Corporation sued ROSS in the United States District Court for the District of Delaware, alleging that ROSS had infringed copyrights in Westlaw's editorial headnotes by using them to develop an artificial-intelligence-based legal-research platform. *See Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, No. 1:20-cv-00613 (D. Del.).

25. On December 11, 2020, ROSS publicly announced that it had "made the difficult decision to shut down operations." ROSS attributed its shutdown to the Thomson Reuters

litigation, which it said had prevented the company from securing additional financing. ROSS announced that its legal-research platform would become unavailable on January 31, 2021, and directed customers to transition to other services, including Fastcase.[1]

26. ROSS also published instructions for transitioning its customers to other legal-research providers, including Fastcase, Casetext, and vLex. Customers seeking to transition to Fastcase were instructed to provide their names, email addresses, remaining ROSS subscription terms, and, optionally, their most recent ROSS invoices. ROSS explained that customers without access to Fastcase through participating bar associations would receive Fastcase accounts for the remainder of their ROSS subscription terms plus three additional months. Thus, ROSS not only announced its shutdown but also took affirmative steps to transition its existing customers away from its platform.[2]

27. ROSS's shutdown and customer transition were widely reported in the legal-technology press. On December 11, 2020, *Artificial Lawyer* reported ROSS's closure and quoted then-Fastcase CEO Ed Walters's commitment to ensure that ROSS subscribers maintained access to legal research during the transition. *Legal IT Insider* likewise reported that ROSS would cease operations on January 31, 2021, while continuing to litigate the Thomson Reuters case. On

[1] ROSS Intelligence, *Announcement* (Dec. 11, 2020), https://blog.rossintelligence.com/post/announcement (last visited Sept. 28, 2026) ("ROSS Press Release").

[2] *See* ROSS Intelligence, *Account Migration to Partners Casetext, Fastcase, vLex* at 1 (undated), https://cdn.prod.website-files.com/5f763b71447910647f0b4f25/5fd54a37d7b9bfb8af148ae5_Account%20migration%20to%20partners%20CaseText%2C%20Fastcase%2C%20vLex.pdf (last visited Oct. 20, 2026).

December 15, *Legaltech News* reported on ROSS's shutdown and the financial difficulties associated with the Thomson Reuters litigation.[3]

28. Following ROSS's shutdown, its co-founder, Arruda, and its former Vice President of Strategy & Operations Thomas Hamilton co-founded Flexpa, a healthcare-data company.[4]

29. On January 31, 2021, when ROSS's platform went offline, ROSS's accounts used to deliver case-law data were disabled. Neither Lawriter, Fastcase, nor Clio furnished additional case-law Updates to ROSS after that date.

30. On February 9, 2021, Fastcase Vice President Christina Steinbrecker Jack emailed Arruda to ask whether Fastcase's finance team should "continue sending invoices." She explained: "Our expectation is that we should pause invoicing, but we wanted to check with you first."

31. Arruda responded: "Yes, things are on pause for now as we fight the good fight but things are looking very good!" His reference to "the good fight" concerned ROSS's litigation with Thomson Reuters; his statement that "things are on pause" described ROSS's own business, which had taken its platform offline nine days earlier. Steinbrecker Jack replied: "Great to hear things are looking good. We'll discontinue invoicing starting next month. Keep in touch!" The February 9, 2021 email exchange is attached as Exhibit B.

32. The February correspondence concerned invoicing in the context of ROSS's announced shutdown. It did not identify any unpaid quarterly installment under the Agreement, forgive amounts already due, specify a date for resuming performance, or establish an indefinite

[3] *See Legal AI Pioneer ROSS to Close, Marking End of Era + Commentary from AL*, Artificial Lawyer (Dec. 11, 2020); *ROSS to Shut in Wake of Thomson Reuters Lawsuit—but Continues to Fight Claim*, Legal IT Insider (Dec. 11, 2020); Victoria Hudgins, *The Hard Truth Behind ROSS Shutdown: Legal Tech Is 'Cash Poor'*, Legaltech News (Dec. 15, 2020).

[4] *See Cofounders*, Flexpa OS, https://os.flexpa.com/founders/ (last visited Oct. 20, 2026).

suspension of ROSS's contractual payment obligations. Nor did it grant ROSS an unconditional right to demand reactivation of the data feed over five years later at its election. No written instrument satisfying the Agreement's requirements for modification or amendment established such a right.

33. ROSS now contends that Fastcase and Lawriter personnel agreed to pause invoicing while the Thomson Reuters litigation proceeded, with the expectation that ROSS would pay accrued amounts if it later restarted, and that Fastcase's then-CEO confirmed that arrangement in a January 4, 2021 call. In reality, no Lawriter or Fastcase representative agreed to suspend ROSS's payment obligations, to forgive or defer accrued installments, or to hold Updates available for ROSS indefinitely. No such arrangement was ever reduced to a written instrument satisfying § 8.3 of the Agreement.

34. Following the February 2021 correspondence, ROSS made no further quarterly Updates payments and did not seek resumption of case-law deliveries until June 18, 2026. By that time, Fastcase had become a wholly owned subsidiary of Clio. Yet during that intervening period, ROSS did not communicate with Lawriter, Fastcase, or Clio about restoring the case-law feed, provide updates concerning a planned resumption of its legal-research service, or propose a timetable for resuming payment and performance under the Agreement. ROSS also did not notify Lawriter, Fastcase, or Clio of any change to its business address or designate a new address for notices under § 8.7 of the Agreement. The September 2023 date on which ROSS now contends the Agreement renewed passed without any such communication or payment. ROSS nevertheless contends that the February correspondence indefinitely suspended the parties' contractual obligations and preserved its right to compel renewed performance whenever it elected to resume operations.

35. In September 2026, the Third Circuit affirmed partial summary judgment against ROSS in the Thomson Reuters litigation. The court held that 2,243 Westlaw headnotes were copyrightable and that ROSS's copying and use of those headnotes to train its competing legal-research platform did not constitute fair use. *See Thomson Reuters Enterprise Centre GmbH v. ROSS Intelligence Inc.*, No. 25-2153, slip op. at 9–10, 27–28 (3d Cir. Sept. 29, 2026).

36. ROSS's prolonged nonpayment, its shutdown, and the adjudication of copyright infringement in the Thomson Reuters litigation reinforce Clio's decision not to enter into a new or expanded data-licensing relationship with ROSS. Independently, Clio maintains that ROSS's uncured material breach of its payment obligations under the existing Agreement excuses Clio from furnishing the additional Updates ROSS now demands.

**C. ROSS Demands Restoration of Updates in 2026.**

37. On June 18, 2026, Arruda emailed Jack Newton, the chief executive officer of Clio, stating that ROSS was "in the process of restarting ROSS operations" and wished "to resume our agreement." He asserted that ROSS and Fastcase had agreed to a "mutual pause of the agreement pending resolution of our circumstances" and that ROSS had "now reached a position where we can resume." Arruda indicated that ROSS was prepared to settle accrued amounts and asked what it would owe for Updates going forward. The email correspondence between Arruda and Newton is attached hereto as Exhibit C.

38. On July 14, 2026, Arruda reiterated that ROSS sought to resume an existing agreement rather than enter into a new one. He asserted that "ROSS is resuming operations and the data agreement is part of that" and warned that, absent a response, ROSS would pursue the matter through "appropriate channels." Ex. C.

39. On August 19, 2026, Newton informed Arruda that Clio would not reestablish a data-licensing relationship with ROSS. On August 26, Arruda distinguished between data

previously delivered under the Agreement, to which he asserted ROSS retained rights, and additional data that ROSS wished to purchase. Specifically, he asserted that ROSS remained entitled to data "already delivered" under § 2.1, but separately stated that "ROSS would like to purchase case updates from January 2020 forward[.]" He requested a price quote for those Updates or confirmation that Fastcase would not sell them to ROSS. Ex. C.

40. That same day, Arruda separately contacted Fastcase's sales department to request pricing and coverage information for Fastcase's Legal Data API offering. He sought a national corpus of published and unpublished federal and state case-law updates from January 2020 forward, together with continuing deliveries. He also requested information concerning positive and negative treatment of cases and counts of negative treatments, to be delivered through an "API or feed, whichever you offer." That inquiry is attached as Exhibit D.

41. On September 1, 2026, Newton again declined ROSS's request for additional data. Arruda responded that the Agreement had been paused by mutual agreement in February 2021, that ROSS had never given notice of termination, and that Newton should identify the contractual basis for its refusal to resume performance. On September 23, Arruda warned that ROSS's counsel would take "next steps" unless Newton supplied an answer or timeline that week. Ex. C.

42. On September 24, 2026, Newton informed ROSS that Clio "has no obligation to reactivate the feed or resume providing data or API services to ROSS." He explained that ROSS had stopped making the payments required by the Agreement more than five years earlier, that its prolonged, uncured material breach excused further performance, and that ROSS's belated willingness to pay did not restore its right to compel renewed deliveries. Separately, and while reserving all arguments about the need for formal cancellation under the circumstances, Newton also provided written notice of ROSS's continuing payment defaults under §§ 3.2 and 4.2. Ex. C.

43. ROSS responded that same day, stating that it "hereby tenders cure" and "will pay all accrued amounts immediately upon receiving an invoice." ROSS asserted that the Agreement had automatically renewed in September 2020 and September 2023 and would renew again in September 2026 for a term extending through September 27, 2029. It maintained that Clio could not discontinue performance without complying with § 7.2's notice-and-cure procedures and characterized Clio's refusal to resume deliveries as a repudiation of the Agreement. Ex. C.

44. ROSS's September 24 email did not identify or remit any payment—including the $12,500 quarterly installments that § 3.2 fixes and that ROSS could calculate from its own payment records. Instead, it conditioned any future payment on Clio first issuing an invoice.

45. As of the filing of this Complaint, and notwithstanding Newton's repeated notices that Clio would not resume updates due to ROSS's long uncured material breach, ROSS has not paid any portion of the overdue installments.

46. On September 28, 2026, counsel for Clio rejected ROSS's demand. The letter explained that the recurring quarterly payments were the agreed consideration for continuing Updates; that the February 2021 invoicing correspondence neither excused ROSS's earlier defaults nor established an indefinite suspension of its contractual obligations; and that ROSS's belated willingness to pay after apparently deciding to restart operations over five years after going out of business did not entitle it to compel renewed performance. The letter also distinguished the right to withhold performance following ROSS's material breach from the Agreement's procedures governing cancellation. The September 28 letter is attached as Exhibit E.

47. On October 5, 2026, ROSS's counsel responded by asserting that the Agreement remained in force through September 27, 2029, and demanding a quarter-by-quarter accounting of amounts allegedly due under §§ 3.2 and 4.2. ROSS maintained that it was entitled to cure any

payment defaults upon receiving that accounting and that Clio would then be required to restore the case-law data feed. ROSS further asserted that Clio's refusal to provide the requested opportunity to cure would itself breach the Agreement. The October 5 letter is attached as Exhibit F.

48. In support of its position concerning the parties' payment and invoicing practices, ROSS's October 5 letter identified nine wire transfers between October 2019 and July 2020, reflecting a base payment amount of $8,493.33. But that amount corresponds to a different agreement between Lawriter and ROSS. On May 11, 2018, the parties entered into a separate license agreement covering statutes and administrative codes (the "May 2018 Agreement"), attached hereto as Exhibit G. Section 3.1 of that agreement required ROSS to pay $101,920 annually, in monthly installments of $8,493.33. Those payments are distinct from the $12,500 quarterly installments required for case-law Updates under § 3.2 of the September 2017 Agreement. The wire transfers identified by ROSS therefore do not establish that it satisfied the quarterly Updates obligations at issue in this action.

49. On October 16, 2026, Clio again rejected ROSS's demand for restored services. Counsel for Clio explained that the right to withhold further performance following ROSS's material breach is independent of the contractual procedures for cancellation; that § 3.2 specifies the amount and timing of ROSS's quarterly payments without conditioning them on receipt of an invoice; and that ROSS's promise in 2026 to pay accumulated amounts did not constitute a seasonable cure of defaults dating back more than six years. Clio further explained that the February 2021 correspondence did not modify those payment obligations or preserve an indefinite right to demand resumed performance. The October 16 letter is attached as Exhibit H.

50. Clio's October 16 letter also noted that Newton had expressly informed ROSS on August 19 and September 1, 2026, that Clio would not reestablish the relationship or provide additional data, yet ROSS made no payment in the weeks that followed. ROSS maintains that Newton's September 24 email was the first notice identifying its alleged payment breach and that § 7.2 afforded it 30 days thereafter to cure. Clio disputes that § 7.2's cancellation procedures confer a new right to cure years-old defaults or displace Clio's independent right to withhold further performance following ROSS's material breach.

51. ROSS's prolonged nonpayment, publicly announced shutdown, affirmative efforts to transition its customers to other legal-research providers, and failure to communicate about resuming performance under the Agreement or seek restored deliveries for more than five years are inconsistent with any intention to continue performing its recurring obligations under the Agreement. ROSS has not paid the overdue quarterly installments on which the Updates are conditioned, and the parties have not agreed to resume performance. Nevertheless, ROSS insists that Clio must now reactivate the case-law data feed and provide accumulated and continuing Updates during a renewal term it asserts extends through September 27, 2029. ROSS maintains that Clio's continued refusal constitutes a breach of the Agreement. Clio disputes that obligation and seeks a declaration of the parties' contractual rights governing its present and future performance.

## **COUNT I — DECLARATORY JUDGMENT**
## **28 U.S.C. §§ 2201, 2202**

52. Clio incorporates the preceding paragraphs as though fully set forth herein.

53. An actual, present controversy exists over the meaning and prospective application of the Agreement's provisions governing recurring Updates payments, continued delivery, renewal, modification, waiver, and the consequences of material nonperformance. The dispute

requires a determination of Clio's duties now and during the purported current renewal term, not merely a finding concerning liability for a past breach.

54. Clio maintains that ROSS's nonpayment of the consideration specifically assigned to continuing Updates constituted an uncured material breach that preceded the additional performance ROSS now demands. Under Virginia law, including the common-law rule that a party who commits the first material breach cannot enforce the contract against the other party and, to the extent UCITA governs, Virginia Code §§ 59.1-507.1 and 59.1-506.1(b)—such material nonperformance excuses the licensor's corresponding future performance independently of the completion of contractual cancellation procedures.

55. Clio further maintains that neither the February 2021 decision to discontinue invoicing nor the automatic-renewal language in § 4.2 granted ROSS an unconditional right to recommence Updates after years of nonpayment. The February 2021 exchange did not address accrued defaults or establish an executory modification entitling ROSS to resume delivery whenever it chose.

56. ROSS's conditional promise to pay after receiving an invoice or accounting did not itself cure its payment defaults, and ROSS has made no payment toward those defaults. *See* Virginia Code § 59.1-507.3(a), (c). Clio has maintained its refusal and expressly notified ROSS of that position in the communications described above.

57. The controversy is immediate. ROSS is requiring Clio to decide whether to reinstate the feed and continue supplying data now; ROSS has expressly maintained that declining its demand is a contractual breach. Without a declaration, Clio must either provide performance it maintains is no longer due or face asserted liability for withholding it.

58. Clio accordingly requests a declaration that:

(a) any license rights ROSS retains under the Agreement in data delivered on or before January 31, 2021, do not include a right to receive additional Updates;

(b) the February 2021 invoicing correspondence and the automatic-renewal clause do not, alone or together, obligate Clio to reactivate or continue the Updates feed notwithstanding ROSS's uncured material payment defaults;

(c) ROSS's conditional offers in 2026 to pay accumulated amounts did not themselves cure its material payment defaults or require Clio to resume delivery; and

(d) Clio has no present or continuing obligation to reactivate the feed or furnish the additional Updates demanded by ROSS for periods after January 31, 2021, or during its asserted renewal term ending September 27, 2029, while ROSS's material payment defaults remain uncured.

59. The requested declaration does not adjudicate any right ROSS may retain in copies of data previously delivered and does not seek damages or an accounting for ROSS's historic nonpayment. It will instead govern the parties' ongoing obligations concerning further deliveries under the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Clio respectfully requests that the Court:

A. Enter the declarations requested in Count I;

B. Award Clio such costs as the Court deems proper and just; and

C. Grant such other and further relief as the Court deems appropriate.

Dated: October 22, 2026

Respectfully submitted,

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation

By: *<u>/s/ Brendan J. Coffman</u>*
Brendan J. Coffman (VSB No. 81986)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8891
bcoffman@wsgr.com

Jess M. Krannich*
Paul J. Sampson*
Andrew P. Follett*
95 S State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510
JKrannich@wsgr.com
PSampson@wsgr.com
AFollett@wsgr.com

David M. Fox*
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
dfox@wsgr.com

** Pro hac vice admission to be sought.*

*Counsel for Plaintiff Themis Solutions Inc. (d/b/a Clio)*