# Exhibit A

# LICENSE AGREEMENT

THIS AGREEMENT is being executed as of the 27th day of September, 2017 (the "Effective Date"), by and between LAWRITER LLC, an Ohio limited liability company with principal executive offices at 1467 Greenbrier Drive, Charlottesville, Virginia 22901 ("Lawriter"), and ROSS Intelligence, Inc., a Delaware corporation, with principal executive offices at 1479 Folsom Street, 94103, San Francisco, CA ("ROSS"), under the following circumstances:

A. Lawriter is engaged in the business of providing electronic legal information services to state bar associations and certain other legal providers and organizations.

B. ROSS is engaged in the business of providing legal information and legal research tools to its website users.

C. Upon the terms and conditions hereinafter set forth, Lawriter desires to license and ROSS desires to acquire court cases produced by Lawriter.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereby agree as follows:

1. Definitions.

| | |
|---|---|
| 1.1 Event of Default | "Event of Default" has the meaning ascribed to it in Section 8 of this Agreement. |
| 1.2 Licensed Data | "Licensed Data" shall mean all of Lawriter's published and unpublished cases including the Updates. |
| 1.3 Treatment API | "Treatment API" shall mean Lawriter's application program interface allowing End Users to retrieve later case positive and negative treatment as provided in Section 5 and Section 9.1 of this Agreement. |
| 1.4 Frequency API | "Frequency API" shall mean Lawriter's application program interface for ROSS to retrieve the number of negative treatments per case as provided in Section 5 and Section 9.1 of this Agreement. |
| 1.5 Updates | "Updates" shall mean Lawriter's cases created after the effective date of this Agreement and any material modifications, updates and upgrades to the API. |
| 1.6 Effective Date | The "Effective Date" shall mean the effective date of this agreement. |
| 1.7 CaseCheck+ | "CaseCheck+" shall mean Lawriter's database of later case negative treatments |

| | |
|---|---|
| 1.8 End User | A direct paying or subscribing customer of the ROSS product |
| 1.9 Affiliate | An entity that directly or indirectly through one or more intermediaries is controlled by ROSS, where the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of ROSS, whether through ownership of voting securities, by contract interest or otherwise. |

2. Grant of License. Subject to the terms and conditions set forth in this Agreement, Lawriter grants to ROSS the following rights and license (collectively, the "License"):

2.1 Lawriter hereby grants to ROSS and its End Users a non-exclusive, worldwide, irrevocable, transferable (subject to Section 2.4), sublicensable (only to a wholly-owned subsidiary or Affiliate of ROSS), perpetual, and royalty free license and right to use, digitize, reproduce, electronically publish, store, market, and distribute the Licensed Data in connection with the production, publication, and distribution of its electronic research service, provided that the distribution of the Licensed Data is limited to ROSS's online service or ROSS's affiliated proprietary websites and provided that ROSS's use of the licensed data shall be restricted by the provisions of paragraphs 2.3 and 2.4 of this Agreement.

2.2 In furtherance of, and without limiting the rights granted above, ROSS shall have the specific right(s):

(a) To advertise, market, distribute, license for use, lease and rent copies of the Licensed Data subject to the terms and conditions of the Agreement, directly or indirectly, for distribution to End Users; and

(b) To permit End Users to download, print or electronically copy Licensed Data subject to this Agreement for any purpose other than that set out in paragraph 2.4 of this agreement and not prohibited by the laws of the United States.

2.3 Nothing in this Agreement shall give ROSS, any End User, or any third party any rights of or claims in ownership of the Licensed Data.

2.4 ROSS shall not sell, convey, nor otherwise transfer the Licensed Data to any third party reseller of such data.

2.5 ROSS shall not be liable for any debt, obligations, responsibility or liability of Lawriter, or any claim against Lawriter whether known or unknown, contingent or absolute, asserted or unasserted, or otherwise relating to the License or the Licensed Data.

2.6 ROSS shall not internally or through a third-party store, maintain, reverse engineer, or make any other use of Lawriter's CaseCheck+ information for any purpose including, without limitation, for purposes of resale or recreation and to use the Treatment API only to retrieve such information for End Users.

2.7 The parties agree that in the event that Lawriter stops doing business in the ordinary course or becomes insolvent, bankrupt or becomes involved in an involuntary proceeding for the protection of creditors, ROSS will have access to the Licensed Data, and ROSS will automatically be deemed to have a non-exclusive, fully paid, irrevocable, royalty-free, perpetual, sublicensable (only to a wholly-owned subsidiary or Affiliate), worldwide right and license to use such Licensed Data without limitation, in order to exercise its rights under this Agreement.

3. Payment.

3.1 ROSS shall pay Lawriter $900,000.00, payable in nine monthly installments of $100,000 each month beginning on the Effective Date.

3.2 ROSS shall pay Lawriter $50,000.00 per year for three years of updates payable in quarterly installments of $12,500.00 per quarter beginning October 1, 2017.

3.2 Payment for API usage shall be as described in Paragraph 5.4 of this Agreement.

4. Delivery and Term.

4.1 Lawriter will provide the Licensed Data to ROSS via an FTP site in html format within one week of the Effective Date.

4.2 Lawriter will provide Ross with Updates for the license term set forth in Section 2.1 of this Agreement. After three (3) years, this Agreement shall automatically renew for successive three (3) year terms, unless ROSS provides written notice of termination at least thirty (30) days prior to the end of the then current term, provided that any pricing for a subsequent term or new agreement will not exceed a five (5) percent increase of the fees paid by ROSS during the preceding term. Cases will be delivered to ROSS within the earlier of: (i) five days of their availability from courts or (ii) when available on Lawriter's casemakerlegal,com website.

5. APIs.

5.1 Lawriter shall provide ROSS with a Treatment API for use by End Users to query cases for later positive and negative treatment. Lawriter shall also provide ROSS with a Frequency API that will enable ROSS to provide End Users with the frequency of the number of case treatments for each case, or each case in a group of cases, retrieved by an End User case query. Lawriter grants to ROSS a non-exclusive, perpetual, transferable (subject to section 2.4 of this Agreement), sublicensable (only to a wholly-owned subsidiary or Affiliate of ROSS) , worldwide, irrevocable, royalty-free right and license to use the Treatment API and Frequency API and use, display and reproduce any content made available through the Treatment API and Frequency API, including but not limited to the Licensed Data, solely for ROSS' online service or ROSS' affiliated proprietary websites.

5.2 During the first year of this Agreement, Lawriter shall allow ROSS free use of the Treatment API by End Users to query 20,000 cases per month for negative treatment. Thus if 20 End Users each query 1,000 cases in a month the 20,000 free use allowance is reached.

5.3 During the second and third years of this Agreement, Lawriter shall allow ROSS free use of the Treatment API by End Users to query 50,000 cases per month for negative treatment.

5.4 Lawriter shall charge ROSS $0.10 per case queried for later negative treatment for usage above the free use allowances described in paragraphs 5.2 and 5.3 of this Agreement. The charge shall be invoiced monthly and shall include a report of the use above the free allowance. After the initial contract term, in the event of renewal, ROSS will continue to have fifty thousand (50,000) End User case queries for free per month, and for any End User case queries in excess of fifty thousand (50,000), the price per End User case query will not exceed a five percent (5%) increase of the current price in the amount of ten cents ($0.10) per case queried by an End User.

5.5 Frequency API usage by ROSS for the purpose of delivery of the frequency of case treatments for End User queries shall be free during the contract term and for the term of any renewal of this Agreement.

5.6 ROSS shall not build nor store, nor transmit for any purpose including, without limitation, for purposes of resale or recreation, the frequencies delivered by the Frequency API, other than to its End Users only by use of the Frequency API.

5.7 Lawriter will use commercially reasonable efforts to ensure ROSS has continuous access to the Treatment API and Frequency API. Lawriter may only block access to the Treatment API and/or Frequency API (a) during scheduled maintenance outside of normal business hours of which ROSS has been notified at least one week in advance or (b) resulting from ROSS's behavior or the performance or failure of ROSS' equipment, facilities or applications.

6. Copyright; Warranties

6.1 ROSS acknowledges Lawriter's copyright in the Licensed Data.

6.2 Lawriter represents and warrants to ROSS that: (i) to the best of Lawriter's knowledge, the transfer of the Licensed Data to ROSS and the API does not and will not violate any copyright, trademark, or other intellectual or proprietary right of any third party and (ii) it will use commercially reasonable efforts to ensure that the Licensed Data and API do not contain any virus, malware or other software that will introduce any virus or harmful code into ROSS' systems or software.

7. Term: Termination and Cancellation.

7.1 The Term shall begin on the Effective Date. Unless this Agreement is earlier cancelled in accordance with the provisions of Subsection 7.2, the Term shall continue for a period of three years after the Effective Date.

7.2 In the event that either party shall breach or fail to perform its obligations under this Agreement and such breach or failure continues for a period of 30 days after notice thereof is received from the other party, the other party shall have the right to cancel this Agreement immediately upon the giving of notice of cancellation to the defaulting party. Cancellation of this Agreement shall not affect the defaulting party's obligations with respect to payments that would have become due and payable to the other during the balance of the then current Term had this Agreement not been cancelled by the other party or the license rights granted in Sections 2.1 and 5.1.

7.3 In the event that the API and/or Licensed Data and/or Updates, or any component thereof, violates the intellectual property rights of any third party, ROSS will immediately cease

use of the infringing component and Lawriter will procure a substantially similar replacement for the infringing item for ROSS to use in accordance with this Agreement. In the event that Lawriter is unable to provide a substantially similar replacement or substitute for the infringing item, ROSS may terminate this Agreement immediately upon notice to Lawriter and will be entitled to a pro-rata refund of all fees paid only with respect to the infringing item under this Agreement.

7.4 EXCEPT IN THE CASE OF ANY BREACH OF SUBSECTION 6.2, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, HOWEVER INCURRED.

8. Miscellaneous.

8.1 Neither party shall be liable for any default or delay in performance of its obligations hereunder (other than any payment obligations), which results directly or indirectly from any cause or circumstance beyond the reasonable control of such party, including without limitation, fire, electrical failure, accidents, acts of God or the elements, war, strikes or labor controversies, sabotage, default or failure of carriers, shortage or breakdown of or inability to obtain any labor, materials, or equipment from regular sources, or actions or requests of government or governmental authorities.

8.2 This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements between the parties.

8.3 No modification or amendment of any provision of this Agreement shall be effective unless made in a written instrument, duly executed by the party to be bound thereby, which refers specifically to this Agreement and states that an amendment or modification is being made in the respects set forth in such instrument.

8.4 No waiver by either party of any breach of any provision of this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such breach or as a waiver of any breach of any other provision of this Agreement. The failure of either party at any time or times to require performance of any provision of this Agreement shall in no manner affect such party's right to enforce the same at a later time.

8.5 Neither party shall assign this Agreement without the prior consent of the other party hereto, except that this Agreement may be assigned by either party to a Successor-in-Interest of such party. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each party. "Successor-in-Interest" means any succeeding entity of either party, whether by merger, acquisition, asset sale, corporate reorganization, or sale of all or substantially all of the assets of the assigning party.

8.6 The invalidity or unenforceability of any provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

8.7 All notices, requests, demands, consents, and other communications hereunder shall be in writing and shall be delivered personally or by telecopy, telefax, electronic mail, or first class prepaid mail, addressed to the party for who intended at its address set forth at the beginning of this Agreement. The sending party shall have the burden of proving receipt. Either party may

change the address to which notices and other communications are to be directed to it by giving notice of such change to the other party in the manner provided in this Subsection.

9. Mutual Cooperation by Parties.

9.1 Lawriter will make best efforts to provide at least 10,000 individual case treatment rankings per minute in response to End User queries for the Frequency API and 6,000 individual case treatment retrievals per minute for the Treatment API.

9.2 Lawriter will share with ROSS programming and other methods to assist ROSS in sorting cases into practice areas.

9.3 ROSS will share with Lawriter the designation of practice areas ROSS makes for each case.

9.4 Lawriter will set up a dedicated ROSS server for the Treatment API and Frequency API within a reasonable time following the execution of this Agreement.

10. Confidentiality.

Each party acknowledges and agrees that pursuant to this Agreement, it may have access to certain confidential information, including but not limited, information and materials concerning the other party's or a third party's business, plans, technology, products and services, which value would be impaired if such information were disclosed to any third party ("Confidential Information"). The receiving party agrees that is will not use in any way nor disclose to any third party, any Confidential Information revealed to it by disclosing party, except as expressly provided in this Agreement. The receiving party will take every reasonable precaution to safeguard and protect the Confidential Information. If Confidential Information must be produced or disclosed by receiving party pursuant to any applicable law or court order, receiving party will provide prompt advance notice of such disclosure in order to enable disclosing party to seek a protective order otherwise prevent such disclosure. Confidential Information does not include information that: (a) is or becomes generally known to the public through no fault of or breach of this Agreement by receiving party; (b) is rightfully known by receiving party at the time of disclosure without obligation of confidentiality; (c) is independently developed by receiving party without use of disclosing party's Confidential Information; or (d) the receiving party rightfully obtains from a third party without restriction on use or disclosure.

11. Indemnification.

Lawriter will defend, indemnify and hold harmless ROSS from and against any and all third-party claims resulting from or arising out of the alleged or actual infringement by the API and/or Licensed Data of any third party intellectual property rights. Lawriter's indemnification obligations will not apply to the extent any such claim arises out of or results from ROSS' improper use or modification of the API and/or Licensed Data.

12. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia. Any suit hereunder will be brought in the federal or state courts in the Commonwealth of Virginia and each party to this agreement hereby submits to the personal jurisdiction thereof.

IN WITNESS WHEREOF, the undersigned have executed this License Agreement, effective as of the Effective Date.

LAWRITER LLC

By______________________________

David P. Harriman,
Chief Executive Officer

ROSS INTELLIGENCE, INC.

By______________________________

Andrew Arruda
Chief Executive Officer