# Exhibit E

WILSON
SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

95 S State Street
Suite 1000
Salt Lake City, UT 84111

O: 801.401.8510
F: 866.974.7329

September 28, 2026

***VIA EMAIL***

Andrew Arruda
ROSS Intelligence, Inc.
650 California Street
San Francisco, California 94108
andrew@rossintelligence.com

**Re: Demand from ROSS Intelligence, Inc. to Themis Solutions Inc.**

Dear Mr. Arruda,

My firm and I represent Themis Solutions Inc. ("Clio"). ROSS Intelligence, Inc. ("ROSS") has demanded that Clio reactivate data feeds and API services under ROSS's 2017 License Agreement ("Agreement") with Lawriter LLC ("Lawriter"). Clio declines.

The relevant history is straightforward. ROSS ceased active operations in 2020. Its FTP access ended on January 31, 2021. The following month, Fastcase agreed to stop sending invoices. ROSS then made no recurring Updates payments and had no further communications with Lawriter or Fastcase concerning performance under the Agreement for more than five years.

ROSS abruptly resurfaced in June 2026 to announce that it was "restarting ROSS operations" and had "now reached a position where [it] can resume." ROSS now contends that the Agreement remained continuously in force during the intervening years and that, because ROSS is ready to return, Clio must resume performance as well.

The Agreement does not give ROSS that unilateral restart right. Nor did Fastcase's agreement to stop sending invoices in 2021 create one.

Most fundamentally, ROSS stopped making the recurring payments required for the very Updates it now demands. Section 3.2 required ROSS to pay $50,000 annually for Updates, in quarterly installments of $12,500. Section 4.2 provided for successive three-year terms. Those recurring payments were the consideration for continuing Updates. ROSS's years-long failure to make them was therefore material: it deprived the licensor of the consideration expressly assigned to the continuing performance ROSS now seeks. *See* Va. Code § 59.1-507.1(b)(2), (b)(3)(B) (addressing substantial failure to perform an essential term and substantial deprivation of a significant reasonably expected benefit); *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154–55 (2001) (holding that missed stock-purchase payments went to the "root" of the transaction and barred enforcement of a related severance-pay provision); *Horton v. Horton*, 254 Va. 111, 116 (1997).

ROSS's automatic-renewal argument only reinforces the point. Your September 24 email contends that the Agreement renewed in 2020, renewed again in September 2023, and remained poised to renew again in September 2026. But the payment obligations did not disappear when each alleged renewal occurred. Even on ROSS's own theory, ROSS failed to make the required Updates payments during the 2020–2023 term and made none during the 2023–2026 term. ROSS cannot invoke successive renewals to preserve its contractual rights while disregarding the corresponding obligations throughout those same terms.

Nor does it matter that Fastcase stopped invoicing ROSS. Section 3.2 does not condition the quarterly Updates payments on receipt of an invoice; it fixes the amount and payment schedule directly. The Agreement demonstrates that distinction expressly: when the parties intended invoicing to be a prerequisite to payment, they said so. Section 5.4 specifically requires monthly invoices and usage reports for API overage charges. ROSS's assertion that it never failed to pay an invoice therefore does not answer the relevant question. It did not make the recurring Updates payments the Agreement required.

The February 2021 correspondence does not change that conclusion. Christina Steinbrecker Jack proposed that Fastcase "pause invoicing" and later confirmed that Fastcase would "discontinue invoicing starting next month." That is evidence of an invoicing accommodation. It is not evidence that Fastcase agreed to suspend the Agreement indefinitely, excuse ROSS from performance through successive renewal terms, and preserve for ROSS an open-ended right to demand renewed services whenever its business circumstances changed.

The Agreement itself forecloses reading so much into that limited exchange. Section 8.3 requires an executed writing that specifically refers to the Agreement and states that an amendment or modification is being made. The February 2021 emails do neither. Section 8.4 likewise provides that a waiver in one or more instances does not constitute a continuing waiver and that a failure to require performance does not eliminate the right to require it later. An agreement to stop sending invoices cannot reasonably be transformed into an indefinite option allowing ROSS to defer its own performance for years and then restart the relationship on demand. *See Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73–74 (1983) (holding that acceptance of reduced payments over many years, standing alone, "does not prove intent to relinquish" full performance).

ROSS's suggestion that Fastcase's refusal to resume performance constitutes "repudiation" is equally misplaced. An uncured material breach excuses the counterparty's corresponding performance. *Horton*, 254 Va. at 115–16 (explaining that an initial material breach leaves the other party "excused from performing his contractual obligations"); Va. Code § 59.1-506.1(b). That principle does not depend on first completing contractual cancellation procedures. Section 7.2 addresses cancellation of the Agreement; it does not require Fastcase to continue providing paid Updates while ROSS remains in material payment default.

Nor does ROSS's recent offer to pay accumulated amounts erase the preceding five-plus years. The Uniform Computer Information Transactions Act permits cure in appropriate

circumstances upon seasonable notice and conforming performance. Va. Code § 59.1-507.3(a)(3). ROSS did not seek to cure after a short delay. It returned more than five years later, after an entire contractual term had passed and another was nearly complete. Nothing in the Agreement gave ROSS the right to preserve a dormant relationship indefinitely and revive it by tendering years of arrears whenever ROSS elected to resume operations.

For the same reasons, ROSS's rights in previously delivered data do not create an entitlement to future performance. Your August 26 email correctly treated those matters separately: ROSS asserted rights under Section 2.1 with respect to data "already delivered," and separately asked Clio to provide post-2020 case updates and treatment data. Whatever rights ROSS may retain with respect to previously delivered data, they do not obligate Clio to restart feeds, provide future Updates, or enter into a new data-services relationship.

Finally, and independently, Mr. Newton's September 24 email expressly notified ROSS of its continuing payment breach under Section 7.2. ROSS acknowledged that notice the same day. That notice remains effective. Clio reserves all rights arising from it, including its right to cancel if the breach remains uncured after the applicable period, without conceding that Section 7.2 gave ROSS a new right to revive the relationship or displaced any of the defenses described above.

ROSS stopped performing under the Agreement more than five years ago. A limited accommodation concerning invoicing did not suspend the Agreement indefinitely or preserve a unilateral right to restart years later. ROSS's prolonged and uncured nonpayment materially breached the Agreement and excuses the future performance ROSS now demands.

Clio therefore will not reactivate the data feed or API services. Clio expressly reserves all rights and remedies.

Sincerely,

*/s/ Jess M. Krannich*

Jess M. Krannich
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation