# Exhibit F

COZEN O'CONNOR

October 5, 2026

**Joshua Hafenbrack**
Direct Phone (202) 280-6492
jhafenbrack@cozen.com

***VIA EMAIL***

Jess M. Krannich
Wilson Sonsini Goodrich & Rosati
95 S State Street
Suite 1000
Salt Lake City, UT 84111

**Re: Demand from ROSS Intelligence, Inc. to Themis Solutions Inc., d/b/a Clio**

Dear Mr. Krannich:

I represent ROSS Intelligence, Inc. and write in response to your September 28, 2026, letter on behalf of Themis Solutions Inc. (d/b/a Clio) and Clio's wholly owned subsidiary, Fastcase, Inc.

Your letter misconstrues the plain language of the September 27, 2017, License Agreement (the "Agreement") and the unambiguous course of dealing between ROSS and Fastcase. Clio has no basis to terminate or cancel the Agreement for the reasons described below. Regardless, Clio's notice of ROSS's purported breach for nonpayment—which was first asserted in Clio CEO Jack Newton's September 24, 2026, email—at most triggers ROSS's contractual right to cure within 30 days. Agreement, § 7.2. ROSS has repeatedly asked for the amount that Clio believes ROSS owes, but Mr. Newton's emails and your letter ignored these requests and have provided no information about the alleged past-due amount.

By October 9, 2026, please provide the amount that Clio claims ROSS failed to pay pursuant to Sections 3.2 and 4.2 of the Agreement (broken down by quarterly payment), so that ROSS can make the payment, cure the alleged breach, and restore the caselaw data feed from Fastcase.

ROSS reserves all rights. Please take all necessary steps to preserve relevant documents related to the Agreement, the parties' course of dealing, and this dispute, including without limitation emails, chat and Slack messages, and text messages, from all relevant employees at Fastcase and Clio.

## I. Background: Fastcase Consented to a Mutual Pause in Invoicing

On September 27, 2017, ROSS entered into a license with LAWRITER, LLC (which did business as Casemaker), under which ROSS received Casemaker's comprehensive database of U.S. judicial opinions and updates of new cases as they were decided, among other things.

Agreement, § 1.2, 1.5. Under its plain terms, the Agreement automatically renewed, in September 2020, for a three-year period that ran until September 27, 2023, Agreement, § 4.2; in September 2023, for a three-year period that ran until September 27, 2026; and again in September 2026, for a three-year period that runs until September 27, 2029.[1]

From 2017 through 2020, ROSS paid the invoiced licensing fees, including a $900,000 upfront fee (paid in nine monthly installments) and then $50,000 per year thereafter (in $12,500 quarterly installments). Meanwhile, in May 2020, an expensive and high-profile litigation between ROSS and Thomson Reuters began in the U.S. District Court for Delaware.

ROSS's payment records illustrate the parties' course of dealing. Between October 2019 and July 2020, ROSS made nine wire transfers to Casemaker, each identifying the specific invoice being paid in the payment instruction. The base payment was $8,493.33, not the $12,500 quarterly installment described in Section 3.2. Several wires covered two invoices at once, with the amount adjusted accordingly. Casemaker invoiced on its own cadence and ROSS paid the full invoiced amount. ROSS continued to pay every invoice it received after Thomson Reuters sued, including on May 18, June 17, July 1, and July 31, 2020. Neither Casemaker nor Fastcase ever sent an invoice for licensing fees under the Agreement that ROSS failed to pay.

On December 31, 2020, Fastcase and Casemaker merged. Around the time of the merger, ROSS CEO Andrew Arruda had conversations with both Fastcase (COO Steve Errick and VP Christina Steinbrecker Jack) and Casemaker, in which they agreed to pause invoicing ROSS while the litigation was unfolding, with the expectation that ROSS could pay the back-due amounts when ROSS restarted its service after the Thomson Reuters litigation concluded. Mr. Errick even provided an example of Fastcase helping another licensing partner—Ravel—"during such a transition," where Ravel's eventual acquirer, LexisNexis, "quickly took care of the A/R post closing." Days after the Fastcase-Casemaker merger, on January 4, 2021, Mr. Arruda spoke with Fastcase CEO Ed Walters, who again expressed encouragement and confirmed that Fastcase would pause invoicing and not seek payment from ROSS as the legal fight with Thomson Reuters unfolded.

Following those conversations, on February 9, 2021, Ms. Steinbrecker Jack emailed Mr. Arruda to "reach out to confirm whether our finance team should continue sending invoices your way. ***Our expectation is that we should pause invoicing, but we wanted to check with you first***." (emphasis added). Ms. Steinbrecker Jack ended with a note of encouragement about ROSS's legal battle with Thomson Reuters: "We're all continuing to root for you and the team!" Mr. Arruda responded that same afternoon to confirm that "things are on pause for now as we fight the good fight" and to thank Fastcase for its "patience and support." Ms. Steinbrecker Jack replied to confirm that Fastcase would "discontinue invoicing starting next month."

[1] Under Section 4.2, the Agreement automatically renewed at the intervals described above "unless ROSS provides written notice of termination at least thirty (30) days prior to the end of the then current term." ROSS never provided such notice, so the Agreement automatically renewed and remains in full force and effect.

Notably, Mr. Arruda kept the ROSS Board of Directors—which at the time included Mr. Newton—fully informed about these developments.

In accordance with the February 2021 email exchange, Fastcase stopped sending invoices pursuant to the parties' mutually agreed "pause" during the Thomson Reuters litigation.[2] Fastcase never sent another invoice; never requested that ROSS resume making payments; and never claimed that ROSS had breached the Agreement.

On November 5, 2025, Clio acquired vLex and Fastcase, including the comprehensive database of U.S. caselaw owned by the merged Fastcase-Casemaker. Clio's top executives have repeatedly made clear that—in sharp contrast to Fastcase—Clio has no intention to license the Fastcase caselaw data to tech and AI companies like ROSS. Instead, Clio is using the Fastcase data to create a data moat around Clio's own vertically integrated AI platform.

On June 18, 2026, Mr. Arruda emailed Mr. Newton and Mr. Walters about resuming the Agreement. Mr. Arruda wrote that ROSS had "worked with Christina Steinbrecker Jack and the Fastcase team on a mutual pause of the agreement pending resolution of our circumstances," but ROSS had "now reached a position where we can resume" and was "prepared to settle any accrued amounts." Mr. Newton responded a week later (on June 25, 2026) that he would need to review the Agreement, but stated: "As a heads up, we are not doing these kinds of data licensing deals on a go-forward basis." On August 16, 2026, Mr. Arruda and Mr. Newton had a phone conversation where Mr. Newton reiterated Clio's policy against licensing the Fastcase data, among other things. Three days later (on August 19, 2026), Mr. Newton wrote that "this is not a relationship we are looking to re-establish" and later (on September 1, 2026) wrote that "Fastcase has decided not to sell or license any further data to ROSS — we are winding down this part of the business."

After repeated follow-ups, Mr. Newton responded via email on September 24, 2026, claiming—for the first time—that ROSS had breached the Agreement. Mr. Newton provided a brief notice of breach, pursuant to Section 7.2, for "ROSS's continuing breach of its payment obligations under Sections 3.2 and 4.2." Mr. Newton did not provide any details about the amount of the alleged non-payment. Mr. Arruda responded the same day, disputing that the Agreement had terminated or that ROSS had breached and, yet again, asking Clio to "please provide the amount owed under the contract so ROSS Intelligence can cure." Mr. Newton never responded.

Your letter followed on September 28.

## II. The Agreement Provides ROSS a Right to Cure

As described below (*infra* Section III), Fastcase has no basis to terminate the Agreement, because it has not complied with the notice-and-cure provisions in Section 7.2 and ROSS did not breach in any event. Regardless, before Fastcase can terminate the Agreement, it must provide ROSS with a notice and 30-day window to cure any alleged breach.

[2] The Third Circuit issued its opinion on ROSS's fair-use defense on September 29, 2026.

1. Fastcase has not provided ROSS with notice and an opportunity to cure.

Section 7.2 is straightforward: it provides that "[i]n the event that either party shall breach or fail to perform its obligations under this Agreement ***and such breach or failure continues for a period of 30 days after notice thereof is received from the other party***, the other party shall have the right to cancel this Agreement." Section 7.2 plainly provides that Fastcase can only cancel the Agreement after: (1) providing notice of an alleged material breach by ROSS; (2) ROSS failing to cure within the 30-day period; and (3) Fastcase providing a separate "notice of cancellation to the defaulting party" after the expiration of that 30-day period. *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (2012) ("It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.").

To satisfy its notice obligation under Section 7.2, Fastcase must provide a breach notice with "enough detail to allow cure," so as to not leave ROSS to a "meaningless guessing game." *Deffenbaugh Industries, Inc. v. Unified Government of Wyandotte County*, 2023 WL 4363439, at *19-20 (10th Cir. July 6, 2023); *Greater Washington Endodontics, P.C. v. Plaza Off. Realty I, LLC*, 2023 WL 8587695, at *6 (Va. Ct. App. Dec. 12, 2023) (denying claim for return of security deposit where the plaintiff failed to provide notice and an opportunity to cure); *Baistar Mech., Inc. v. Billy Casper Golf, LLC*, 2015 WL 10990120, at *3 (Va. Oct. 22, 2015) (holding that termination must comply with contract's notice and opportunity to cure requirements); *Morris Silverman Mgmt. Corp. v. W. Union Fin. Servs., Inc.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003) (The general rule is that, to be effective, a notice terminating a contract must be clear and unequivocal." (quoting 17B C.J.S. Contracts § 446 (2002)); *Cedar Rapids Television Co. v. MCC Iowa LLC*, 524 F. Supp. 2d 1127, 1136 (N.D. Iowa 2007) ("A clear and unambiguous notice, timely given, and in the form prescribed by the contract is essential to the exercise of an option to terminate the contract."); *IP Global Investments America, Inc. v. Body Glove IP Holdings, LP*, 2018 WL 5983550, at *6 (C.D. Cal. Nov. 14, 2018) (holding that a "vague notice would defeat the purpose to provide an opportunity to cure").[3]

Here, Mr. Newton's email ignored ROSS's repeated requests for the amount that Clio claims is owed under Sections 3.2 and 4.2. It did not specify the amount that ROSS must pay to cure the alleged breach. Your letter likewise barely mentions Section 7.2 and does not provide any details on the amount that ROSS allegedly failed to pay under the Agreement.

**Please promptly provide the amount that Clio/Fastcase believes ROSS failed to pay pursuant to Sections 3.2 and 4.2**, broken down by quarterly payment. If Clio is refusing to provide ROSS with an opportunity to cure—despite the unambiguous language and express requirement of Section 7.2—please state that in writing.

The Uniform Computer Information Transactions Act, *see* Va. Code § 59.1-507.3—which your letter cites (at 2-3)—only reinforces ROSS's right to cure. That provision provides ROSS

[3] *See also, e.g., Ulla-Maija, Inc. v. Kivimaki*, 2005 WL 2429490, at *4 (S.D.N.Y. Sept. 30, 2005) ("It is settled law . . . that the notice must be specific enough so as to give the other party a reasonable opportunity to cure the breach if this can be done."); *240 W. 37th LLC v. BOA Fashion, Inc.*, 2009 WL 2603146, at *1 (N.Y. App. Aug. 24, 2009) (similar).

with a statutory right to cure, on top of ROSS's contractual right to cure provided by Section 7.2. Specifically, Va. Code § 59.1-507.3(a)(1) entitles ROSS to "cure the breach at its own expense if . . . the time for performance has not expired and the party in breach seasonably notifies the aggrieved party of its intent to cure and, within the time for performance, makes a conforming performance." That is what ROSS has done here. Clio raised the purported breach for the first time on September 24, 2026. ROSS immediately notified Clio of its intent to cure and will make the required back payments—once Clio confirms the amount—within the time for performance, i.e., within the 30-day cure window.[4]

## III. Clio Has No Basis To Terminate the Agreement

In any event, Clio has no basis to terminate the Agreement for at least two separate and independent reasons: (1) Clio has not complied with the notice-and-cure requirements of Section 7.2, which is a condition precedent to terminating or cancelling the agreement; and (2) ROSS did not commit any material breach in any event.

1. <u>Clio has not complied with the Section 7.2 condition precedent</u>.

By its plain terms, providing notice and an opportunity to cure is a condition precedent to cancelling the Agreement pursuant to Section 7.2. *Greater Washington Endodontics*, 2023 WL 8587695, at *6 (holding that "notice of breach was a condition precedent" to recovering money owed under the contract); *Beckner v. Friendly Ice Cream Corp*., 2004 WL 1662290, *3 (Va. Cir. Ct. 2004) ("[T]he notice requirements with respect to default are express conditions precedent to seeking termination of the Lease. Absent proper and adequate notice to Friendly's in compliance with the Lease, Beckner is without authority to terminate the Lease."); *Eskandari v. Auto Imports of Woodbridge Inc*., 2022 WL 18777794, *2 (Va. Cir. Ct. 2022) (holding that contract's notice and cure provision created a condition precedent).[5]

Here, Section 7.2 requires that Fastcase give ROSS notice of the alleged breach and an opportunity to cure within 30 days before seeking to cancel the Agreement. For the reasons described above, Fastcase has refused to provide ROSS with the information (i.e., the past-due amount) that would allow ROSS to cure the alleged breach for nonpayment within the 30-day

---

[4] Moreover, under § 59.1-507.3(a)(2), ROSS had "reasonable grounds" to believe its performance was not deficient in light of Fastcase explicitly agreeing to the payment pause and not raising any issue about those non-payments while ROSS's legal battle with Thomson Reuters remained ongoing. To the extent § 59.1-507.3(a)(1) and § 59.1-507.3(a)(2) do not apply, then ROSS merely must notify Fastcase "of its intent to cure" and provide a "conforming performance before cancellation" under § 59.1-507.3(a)(3)—which, again, ROSS intends to do within the 30-day cure window after Clio confirms the alleged unpaid amounts.

[5] *See also, e.g., Sun Secured Fin. LLC v. ARCS Com. Mortg. Co. LP*, 730 F. Supp. 2d 132, 139 (D.D.C. 2010) ("[N]otice provisions are generally understood to be conditions precedent to the exercise of power about which notice is being given."); *Lively v. Wayfarer Studios LLC*, 2026 WL 905447, at *18 (S.D.N.Y. Apr. 2, 2026) ("[C]ourts have held that notice and an opportunity to cure is an element of performance that the plaintiff must satisfy before bringing a claim for breach of contract.").

---

window. Unless and until Fastcase does so, it cannot terminate the Agreement. Indeed, if Fastcase wrongfully terminated the Agreement without providing ROSS an opportunity to cure, that would, in itself, constitute a breach of the Agreement. *Shen Valley Masonry, Inc. v. S.P. Cahill & Assocs., Inc.*, 2001 WL 34038625, at *8 (Va. Cir. Ct. 2001) (finding wrongful termination of contract where contractor did not provide subcontractor written notification of breach and an opportunity to cure, as required by contract).

2. <u>ROSS has not breached the Agreement</u>.

In any event, ROSS did not breach any payment obligation under the Agreement. As shown in the correspondence recounted above, Fastcase agreed (and indeed, affirmatively suggested) that Fastcase would pause invoicing and ROSS would not make licensing payments while ROSS's legal battle with Thomson Reuters was ongoing. Fastcase cannot agree to a mutual pause in invoicing and then turn around and use ROSS's nonpayment as the basis for a material breach. *Lataif v. Com. Indus. Const., Inc.*, 286 S.E.2d 159, 161 (Va. 1982) (a party is equitably estopped where its representation induces the other "to refrain from taking an action he otherwise would have taken"; "when one has lulled another into inaction to his detriment, the [other] may invoke estoppel.").

Your letter characterizes the February 2021 correspondence as an "invoicing accommodation" that did not excuse ROSS's nonpayment. The record is to the contrary. Fastcase initiated the pause: Ms. Steinbrecker Jack wrote that "our expectation is that we should pause invoicing," ROSS agreed that "things are on pause for now," and Fastcase confirmed it would "discontinue invoicing." Fastcase thus proposed the arrangement, implemented it, and said nothing for more than five years.

It is nonsensical to interpret the parties' agreement in February 2021 as only meaning that Fastcase would pause sending invoices while ROSS remained obligated to submit the quarterly payments anyway. If that were the case, the pause would have been meaningless. What's more, Fastcase did not put any time limits on the pause, never sent an invoice that ROSS failed to pay, and never claimed that ROSS's non-payment breached the Agreement, whether during the 2020-2023 term or the 2023-2026 term (until Mr. Newton's email).

Clio's reliance on *Stanley's Cafeteria, Inc. v. Abramson* is misplaced. 306 S.E.2d 870 (Va. 1983). That case proves why ROSS did not breach. There, the Virginia Supreme Court held that mere "acquiescence"—a party's silent "failure to protest or object" to less-than-full performance—does not by itself prove waiver of the asserted breach. *Id.* at 873. Here, Fastcase did not just passively acquiesce in ROSS's payment pause—it affirmatively proposed and confirmed the pause in writing. Moreover, even if Fastcase had changed its mind at some point about the payment pause, it never objected to ROSS or provided a notice of breach for non-payment—until Mr. Newton's September 24 email (which at most triggers ROSS's contractual right to cure).[6]

---

[6] *Stanley's Cafeteria* only addressed whether the contracting party waived a contractual right by accepting partial performance. That is a separate question from whether Fastcase is equitably estopped from agreeing to the payment pause and then using that pause as the basis to attempt to

Footnote continued on next page

Sections 8.3 and 8.4 do not change the analysis for similar reasons. Those clauses simply allow the parties to refrain from enforcing a contractual obligation without permanently giving up the right to enforce that obligation later. *Virginia Elec. & Power Co. v. Norfolk S. Ry. Co.*, 683 S.E.2d 517, 532 (Va. 2009). That just means Fastcase could choose to start enforcing the payment provisions again in the future after agreeing to pause them in February 2021. But Fastcase never did so until Mr. Newton's September 24 email, so these provisions are beside the point.

* * *

I am available to discuss any of the above. ROSS looks forward to your prompt response.

Sincerely,

*/s/ Joshua Hafenbrack*

By: Joshua Hafenbrack

cc: Paul J. Sampson, Joan Taylor

cancel the Agreement. *Stanley's Cafeteria*, 306 S.E.2d at 873 ("As distinguished from estoppel, waiver is an *intentional* relinquishment of a known right.").