# Exhibit H

WILSON
SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation
95 S State Street
Suite 1000
Salt Lake City, UT 84111
O: 801.401.8510
F: 866.974.7329

October 16, 2026

***VIA EMAIL***

Joshua Hafenbrack
Cozen O'Connor
2001 M Street NW, Suite 500
Washington, D.C. 20036
jhafenbrack@cozen.com

**Re: ROSS Intelligence, Inc.—September 27, 2017 License Agreement**

Dear Josh,

We write in response to your October 5, 2026 letter on behalf of ROSS Intelligence, Inc. ("ROSS") concerning the 2017 License Agreement ("Agreement").

ROSS's positions as set forth in your letter rest on two fundamental errors. First, ROSS treats Fastcase's decision to discontinue invoicing ROSS in February 2021 as an agreement to suspend ROSS's contractual payment obligations indefinitely—even though ROSS had already stopped paying, and neither the Agreement nor the correspondence supports that interpretation. Second, it conflates *cancelling* the Agreement with Fastcase's independent legal right to withhold further performance in response to ROSS's material breach.

ROSS stopped performing its payment obligations more than six years ago, publicly announced that it was shutting down, and did not communicate or make any effort to resume the relationship until June 2026. Its belated offer to pay cannot undo years of material nonperformance or compel Fastcase to resume providing case-law updates under these circumstances. Clio therefore rejects ROSS's demand to restore the data feed.

## I. ROSS Materially Breached Its Payment Obligations Years Ago.

The Agreement provided for two distinct types of consideration. Under § 3.1, ROSS paid $900,000 for the initial license to Lawriter's published and unpublished cases. Under § 3.2, ROSS separately agreed to pay $50,000 annually, in quarterly installments of $12,500, for continuing "Updates"—including cases created after the Agreement's effective date. Thus, the initial payment secured ROSS's license to the underlying case-law data, while the recurring payments compensated Lawriter for continuing Updates.

Your letter does not dispute that ROSS stopped making the required quarterly payments. Instead, it points to nine wire transfers between October 2019 and July 2020, each reflecting a base payment of $8,493.33, as evidence of the parties' purported "course of dealing." Letter at 2. But those payments concern an entirely different agreement.

In May 2018, Lawriter and ROSS entered into a separate license covering statutes and administrative codes (the "2018 License"). Section 3.1 of that agreement required payments of $101,920 annually, in monthly installments of $8,493.33—precisely the amount of the payments your letter identifies. Those payments therefore appear attributable to the 2018 License, not the quarterly obligations under the 2017 Agreement. At a minimum, they do not establish that ROSS satisfied its obligations under § 3.2. If ROSS contends otherwise, please identify the invoices and corresponding wire references supporting that contention.

More importantly, your letter identifies no payment satisfying § 3.2 after mid-2020. ROSS thus breached its payment obligations during the Agreement's initial three-year term, well before the December 2020 and February 2021 communications on which it now relies.

That breach was material. The recurring payments were the consideration for Lawriter's continuing delivery of Updates. ROSS's failure to make those payments (and all payments due thereafter) deprived Lawriter of an essential benefit of the bargain. *See Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154–55 (2001) (a breach is material when it defeats an essential purpose of the agreement); Va. Code § 59.1-507.1(b) (defining material breach under Virginia's Uniform Computer Information Transactions Act ("UCITA")).

ROSS's subsequent conduct confirms that this was not an isolated missed installment. On December 11, 2020, ROSS publicly announced that it had decided to "shut down operations," advised customers to transition to other services—including Fastcase—and announced that its platform would become unavailable on January 31, 2021.[1] Its FTP access ended that day. ROSS thereafter made no further quarterly payments and did not seek renewed performance under the Agreement until June 2026, more than five years later. Meanwhile, ROSS's leadership moved on. For example, Mr. Arruda co-founded Flexpa, a health-data company, with Thomas Hamilton, ROSS's former Vice President of Strategy and Operations.[2]

That history is inconsistent with ROSS's present attempt to treat the Agreement as an uninterrupted obligation to supply Updates throughout its years of nonperformance. *See Bd. of Supervisors v. Ecology One, Inc.*, 219 Va. 29, 33–34 (1978) (recognizing that abandonment may be established through conduct inconsistent with an intention to perform).

## II. The February 2021 Correspondence Did Not Suspend ROSS's Payment Obligations.

Your letter principally relies on Fastcase's February 2021 decision to discontinue invoicing. But the correspondence says nothing about suspending the Agreement itself, excusing

---

[1] ROSS Intelligence, *Announcement* (Dec. 11, 2020), https://blog.rossintelligence.com/post/announcement (last visited Sept. 28, 2026).

[2] *See Cofounders*, Flexpa OS, https://os.flexpa.com/founders/ (last visited Sept. 28, 2026).

ROSS's earlier payment defaults, or granting ROSS an indefinite right to resume receiving Updates whenever it might restart operations.

The distinction between *invoicing* and *payment* is critical. Section 3.2 expressly requires quarterly payments of $12,500 beginning October 1, 2017. It does not condition those payments on receipt of an invoice. Where the parties intended to require invoices, they said so expressly: § 5.4 provides that charges for excess API usage "shall be invoiced monthly." No corresponding condition appears in § 3.2.

The February 9, 2021 correspondence follows that distinction. Ms. Steinbrecker Jack asked whether Fastcase should "continue sending invoices" and explained that Fastcase expected to "pause invoicing." After Mr. Arruda responded that "things are on pause for now," she confirmed that Fastcase would "discontinue invoicing starting next month." Those statements concern invoicing. None purports to amend § 3.2, forgive accrued payments, or establish a new arrangement under which ROSS could defer its obligations indefinitely while preserving an unconditional right to future performance.

The surrounding circumstances reinforce that reading. By February 2021, ROSS had publicly announced its shutdown, discontinued its platform, and ceased receiving data through the FTP connection. Fastcase stopped invoicing and pursuing collection because ROSS had announced its shutdown and Fastcase no longer expected payment. Fastcase regarded the commercial relationship as over; it made no commitment to preserve future services until ROSS chose to return.

Contemporaneous correspondence also undermines ROSS's suggestion that it was consistently current on its invoiced obligations. On October 5, 2020, Steve Errick told Mr. Arruda that Fastcase was "closing in on $100k in overdue A/R" for regulatory feeds. Fastcase's February 22, 2021 accounts-receivable records likewise continued to reflect substantial amounts outstanding from ROSS. Those records concern receivables beyond the case-law obligations at issue here and are not offered as an accounting under the 2017 Agreement. But they are inconsistent with the broader suggestion that ROSS had invariably paid its invoiced obligations. And they reinforce that discontinuing invoices in February 2021 did not somehow extinguish amounts already due.

The Agreement also expressly protects against the informal modification your interpretation requires. Section 8.3 provides:

> No modification or amendment of any provision of this Agreement shall be effective unless made in a written instrument, duly executed by the party to be bound thereby, which refers specifically to this Agreement and states that an amendment or modification is being made in the respects set forth in such instrument.

Your letter identifies no such amendment. UCITA likewise recognizes the enforceability of contractual requirements for authenticated modifications. Va. Code § 59.1-503.3(b).

Nor do the parties' invoicing practices establish an indefinite waiver. Section 8.4 expressly provides that a party's failure to require performance does not impair its right to enforce that provision later. UCITA similarly provides that waiver of a remedy for one performance does not waive remedies for subsequent performances unless the waiving party expressly says so. Va. Code § 59.1-507.2(d). Nothing in the February correspondence purports to waive Fastcase's rights concerning all future quarterly installments.

Your equitable estoppel argument fares no better. Estoppel requires a representation that induces detrimental reliance. *See Lataif v. Com. Indus. Constr., Inc.*, 286 S.E.2d 159, 161 (Va. 1982). Here, ROSS stopped paying months before the emails you point to. It publicly announced its shutdown in December 2020, and its platform ceased operating on January 31, 2021—before the February 9 email exchange. Fastcase therefore did not induce ROSS's initial nonpayment or its decision to shut down. Nor does your letter identify any subsequent detrimental change of position undertaken in reliance on an alleged representation that Fastcase had permanently suspended ROSS's payment obligations.

The earlier communications do not establish otherwise. Expressions of encouragement concerning ROSS's litigation or optimism about its prospects in 2021 do not establish an agreement to suspend contractual obligations indefinitely. Simply put, nothing in the record establishes that Fastcase promised to resume deliveries years later upon ROSS's unilateral request.

**III. ROSS's Material Breach Excused Fastcase's Further Performance, Regardless of Whether the Agreement Was Cancelled.**

Your letter devotes considerable attention to § 7.2's notice-and-cure requirements. But that provision does not establish the right ROSS seeks to enforce.

Section 7.2 addresses *cancellation*: it allows a nonbreaching party to cancel the Agreement if a breach remains uncured for 30 days after notice, followed by notice of cancellation. It does not state that cancellation is the exclusive remedy for breach or require the nonbreaching party to continue performing while a material breach remains uncured. Indeed, nothing in § 7.2 suggests that a party that has materially breached its payment obligations for years may compel continued performance simply because the other party has not formally cancelled the Agreement.

Virginia law expressly recognizes the distinction. Under *Horton v. Horton*, 254 Va. 111, 115–16 (1997), a party that commits the first material breach cannot enforce the contract against the nonbreaching party, whose further performance is excused.[3] UCITA similarly provides that,

[3] Separately, Mr. Newton's August 19 and September 1 emails expressly informed ROSS that Fastcase would not reestablish the relationship or license it additional data. Those communications further undermine any suggestion that ROSS reasonably believed Fastcase remained willing to resume performance at ROSS's election. They also made clear Fastcase's position, and if any cure right still existed (it did not), that right lapsed even under ROSS's

following an "uncured material breach," the aggrieved party "need not perform," subject to an exception for contractual use terms. Va. Code § 59.1-506.1(b). ROSS's breach was uncured for years: its belated expression of willingness to pay is not itself a cure, and UCITA expressly provides that "notice of intent to cure does not preclude refusal or cancellation for the uncured breach." *Id.* § 59.1-507.3(c). As explained below, ROSS's opportunity to effect a seasonable cure has long since passed. Thus, the right to withhold further performance does not depend on first completing the contractual procedures for cancellation. *See Virginia Brands, LLC v. Kingston Tobacco Co.*, No. 4:10CV00009, 2010 WL 5136197, at *7 (W.D. Va. Dec. 10, 2010) (holding that material nonpayment excused continued performance notwithstanding contractual termination-notice provisions).

Indeed, one of the authorities your letter cites illustrates precisely this distinction. In *Shen Valley Masonry, Inc. v. S.P. Cahill & Associates, Inc.*, 57 Va. Cir. 189, 199–200 (2001), the court found that a contractual termination was improper for failure to provide the required notice. Nevertheless, it separately held that the contractor's prior material breach excused the subcontractor's further performance and barred the contractor from enforcing the subcontract. Your other authorities likewise address whether termination was effective without the required notice—not whether a party must continue performing notwithstanding the other party's longstanding prior material breach.

Moreover, ROSS's insistence on formal notice is especially at odds with its own conduct. ROSS publicly announced that it was shutting down in December 2020, discontinued its platform in January 2021, and effectively disappeared as an operating entity and from the contractual relationship for more than five years. Its principal contact, Mr. Arruda, moved on to other business ventures. And although § 8.7 directs contractual notices to the parties' designated addresses and expressly permits either party to change its address by providing notice to the other, ROSS vacated its designated address at 1479 Folsom Street in San Francisco without ever providing Fastcase with a replacement. Although § 8.7 also permits notice by email, ROSS's failure to maintain a contact and its contractual notice information underscores the unreasonableness of its position. Having shut down its business and ceased participating in the contractual relationship, ROSS can hardly fault Fastcase for failing to chase down the empty shell of a company that ROSS became with formal notice under § 7.2, much less transform that omission into an affirmative obligation to resume performance years later.

Ultimately, however, the notice dispute is beside the point. Clio's refusal to resume delivering Updates rests on ROSS's longstanding uncured material breach, not on a contention that Clio has already completed the cancellation procedure prescribed by § 7.2. That provision does not require Fastcase to continue performing while ROSS remains in material breach, and ROSS cannot convert a contractual condition on cancellation into an unconditional right to continued performance.

---

argument. In any event, as explained above, Fastcase's right to withhold performance following ROSS's material breach does not depend on whether the Agreement was formally cancelled.

**IV. ROSS Cannot Cure Its Years-Old Material Breach.**

Your letter repeatedly expresses ROSS's willingness to pay accrued amounts. But ROSS's belated offer to pay cannot undo years of material nonperformance or compel Fastcase to resume providing Updates. ROSS's opportunity to cure has long since passed.

Under UCITA, a party seeking to cure must "seasonably" notify the other party of its intent to cure and provide conforming performance within the applicable time. Va. Code § 59.1-507.3(a). "Seasonable" means within the agreed time or, absent an agreement, within a reasonable time. *Id.* § 59.1-501.2(a)(59). And the statute expressly provides that "notice of intent to cure does not preclude refusal or cancellation for the uncured breach." *Id.* § 59.1-507.3(c).

ROSS cannot satisfy these requirements. Its quarterly payments began coming due without payment in 2020. Rather than fulfill those obligations, ROSS shut down its operations, discontinued its platform, and made no effort to resume performance for more than five years. Its June 2026 proposal to restart the relationship and pay accumulated installments was not a seasonable attempt to cure obligations that had gone unperformed for years.

Nor does ROSS satisfy UCITA's alternative grounds for cure. Section 59.1-507.3(a)(1) applies where the time for performance has not expired; the deadlines for ROSS's missed installments expired years ago. Subsection (a)(2) requires reasonable grounds to believe that the deficient performance would be acceptable, followed by seasonable notice and conforming performance within a further reasonable time. ROSS cannot reasonably claim that the February 2021 emails on record rendered years of nonpayment acceptable, much less that an attempted cure in 2026 came within a reasonable time. And subsection (a)(3) likewise requires seasonable notice and prompt conforming performance before cancellation. ROSS has provided neither. Its willingness to pay now does not establish an effective cure under any of these provisions.

ROSS's reliance on § 7.2 does not change the result. As explained above, that provision establishes the prerequisites for *cancellation* under the Agreement. It does not retroactively excuse years of nonpayment, reset the original payment deadlines, or require Fastcase to resume performance notwithstanding ROSS's prior material breach. Mr. Newton's September 24, 2026 notice, clearly couched as a procedural clarification, did not transform ROSS's years-old payment obligations into newly accruing obligations that ROSS could satisfy at its leisure.

Your demand for a quarterly accounting rests on the same mistaken premise: that ROSS can compel Fastcase to resume performance simply by tendering accumulated payments now. Section 3.2 expressly specifies the amount and frequency of ROSS's payment obligations, without conditioning those payments on invoices or an accounting from Fastcase. ROSS knew what it owed under the Agreement and what it had paid. It cannot shift responsibility for its own longstanding nonperformance to Fastcase by insisting that Fastcase reconstruct the payment history before ROSS will act. Nor does the Agreement require Fastcase to provide such an accounting as a condition of withholding performance following ROSS's material breach.

More fundamentally, ROSS's proposed cure comes too late. Its material breach occurred years ago and excused Fastcase's further performance. Neither a belated offer to pay nor a demand for an accounting can restore ROSS's right to compel that performance. Clio therefore rejects ROSS's demand for a quarterly accounting in furtherance of its purported cure, just as it rejects ROSS's demand to resume delivering Updates. Clio expressly reserves all rights concerning ROSS's unpaid obligations and the consequences of its material breach.

**V. ROSS's Recent Commercial Inquiry Further Undermines Its Demand.**

ROSS's own recent correspondence also reinforces the problems with its position. On August 26, 2026—after Mr. Arruda had contacted Mr. Newton about purportedly resuming the Agreement—Mr. Arruda separately emailed Fastcase's sales department requesting a price quote for data feeds through Fastcase's Legal Data API. His request covered federal and state case-law updates from January 2020 forward, ongoing deliveries, and positive and negative treatment data. He requested a bulk backfile followed by incremental deliveries in JSON or XML, and asked Fastcase to provide "pricing and coverage details."

That inquiry is difficult to reconcile with ROSS's current portrayal of the relationship. If the Agreement had merely been placed on hold, with ROSS retaining an unconditional right to resume receiving the requested data upon payment of accumulated fees, why did Mr. Arruda seek a commercial quotation for historical and ongoing deliveries instead of invoking that purported right?

To be sure, the August inquiry concerned Fastcase's current Legal Data API offering, whereas the 2017 Agreement defined particular "Licensed Data," "Updates," and API services. Agreement §§ 1.2-1.5. But that distinction only underscores the problem with ROSS's demand. The Agreement did not confer an unrestricted entitlement to every subsequently developed Fastcase data product or delivery mechanism. And nothing in Mr. Arruda's August inquiry suggests that Fastcase was under an existing obligation to provide the requested products without a new commercial arrangement.

In all events, regardless of the precise scope of the products requested, ROSS's longstanding material breach defeats its demand to compel resumed performance under the Agreement.

Clio will not enter into a new licensing arrangement with ROSS. ROSS stopped paying its bills, announced its shutdown, and left substantial obligations unresolved for years. Fastcase also bore the burden of testimony and document production in ROSS's copyright litigation. The Third Circuit has now affirmed the ruling rejecting ROSS's fair-use defense. That history has destroyed the trust necessary for a further commercial relationship. Clio will not assume those payment and litigation risks again to support ROSS's restart. ROSS should make other arrangements for its data needs.

* * * * *

Clio has issued a litigation hold concerning this matter. Please ensure that ROSS preserves all relevant documents and communications concerning the Agreement, the separate 2018 License, payments under either agreement, the decision to discontinue operations in 2020, the purported cessation of invoices, ROSS's efforts to resume operations, and the present dispute. That includes relevant board materials, accounting records, emails, chat messages, and other electronic communications within ROSS's possession, custody, or control.

Clio rejects ROSS's demand to resume delivering case-law data and expressly reserves all rights, claims, defenses, and remedies under the Agreement and applicable law.

Sincerely,

*/s/ Jess M. Krannich*

Jess M. Krannich
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation